R. J. DEWEY v. STATE.

186 So. 224.

Division A.

Opinion Filed July 20, 1938.

On Rehearing November 22, 1938.

*J. L. Blackwell, Pat Whitaker* and *Zach H. Douglas* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

BUFORD, J.—Plaintiff in error Dewey was convicted of murder in the second degree under an indictment charging murder in the first degree of his wife, Margaret Dewey.

Plaintiff in error and his mother were jointly indicted. The first trial resulted in a mistrial. On the second trial the mother was acquitted and Dewey convicted, as above stated.

The sole question presented is whether or not the evidence was legally sufficient to warrant the conviction.

The record shows that Margaret Dewey came to her death by a gun or pistol shot wound inflicted at close range; that the bullet entered her body at the left breast close to

the nipple, ranged downward and came out the back, Where that bullet went to is not shown.

Dewey reported the death on the morning after he said it occurred. Investigation developed that there was practically no blood on the body, a very small spot of blood on the floor where the body was lying, but there were blood splashes on the wall; that the deceased was robed only in a night-gown when she came to her death. There were powder burns on her left breast and on her left hand. The pistol which was found near the body contained one un-exploded cartridge and two empty shells. A bullet had passed through a closet door 3 feet 10 inches from the floor in the room where the body was found. That bullet passed through the door and through some clothing that was hanging inside the closet and dropped from the clothing to the floor during the investigation. Dewey reported to neighbors and to the Sheriff the next morning that about 9 o'clock on the night before he was lying on the floor in front of the fire; that his wife went across the room near to a radio, that he thought she was going to turn on the radio; that he heard the report of a shot and his wife fell; that he got up, looked for his automobile or truck keys and did not find them; that he then covered the body up with a blanket and went to bed and went to sleep. He also told the neighbors and the Sheriff that when the shot was fired his mother, who was sleeping in the house, awakened and asked what was the matter, or something to that effect, and he told her to "go back to sleep," which she did. He got up the next morning and reported what he termed a suicide.

Some other pistol cartridges were found on the floor of the room and Dewey told neighbors and the Sheriff that his wife dropped those when she was loading the pistol.

He had his wife's body prepared for burial, took it to

Arkansas and was later arrested in New Orleans, La., and brought back to Suwannee County for trial.

The record shows that the bullet hole in the closet door was higher from the floor than the place where a hole would have, in all reasonable possibility, been made if made by the same bullet which ranged through the woman's body from the left nipple downward out the back and continuing on to the door.

The jury was justified in reaching the conclusion that there were two shots fired. Dewey only accounted for one shot being fired. Dewey took the stand in his own behalf but made no explanation to the jury of how the homicide occurred.

It is well settled that when a defendant does not take the stand in his own behalf such circumstance is not to be considered as any evidence of guilt, but when a defendant charged with the unlawful homicide of another takes the stand in his own behalf, then the jury may consider what he says and what he may fail to say as bearing upon the merits of the case.

Before Dewey took the stand the Sheriff had testified about the conversation that Dewey had with him in regard to the homicide. When Dewey took the stand in his own behalf the following occurred:

"By Mr. Blackwell: Your name is R. J. Dewey? Ans. Yes, sir.

"Q. Was Mrs. Margaret Dewey your wife? Ans. She was.

"Q. You had been married to her about how long?

"A. Three or four years.

"Q. Did you kill Mrs. Margaret Dewey? Ans. No, Sir.

"Q. Did you assist anyone to kill her? Ans. No, Sir.

"Q. You heard Sheriff Cannon testifying yesterday

about the statements made by you as to her killing herself; is that statement substantially correct?

"Ans. I don't understand the question.

"Q. You heard the Sheriff testify yesterday? Ans. Yes, sir.

"Q. Did you hear him say that you made a statement regarding Mrs. Dewey killing herself? Ans. Yes, sir.

"Q. Was that statement substantially true?

"The State objects to the question upon the ground that it is not the proper way to ask the question.

"The Court remarks that he cannot direct counsel how to ask his questions.

"A. I still don't understand the question.

"By the Court: The question is, You heard the Sheriff testify as to what you told him; now is what the Sheriff said that you said to him substantially true?

"Q. What I told him about what?

"By the Court: What you said about your wife killing herself.

"The witness did not reply.

"By Mr. Blackwell: Did you tell the Sheriff that your wife killed herself?

"A. Yes, sir.

"Q. Did you tell him the position in which she was standing when she killed herself? Ans. I don't remember.

"Q. Do you remember in what position she was standing when she shot herself?

"A. I did not see her kill herself. I saw her with the gun in her hand, but I am a little turned around in here as to directions. When I saw her with the gun in her hand, she was facing the door kind a towards the double bed in the house. I did not see her shoot, and I could not say how she was standing.

"Q. Did you hear a report of a gun?

"A. A very dull report.

"Q. Your home out there faces what direction?

"A. It is kinda catacornered and faces West and North. But a little more West than North.

"By Judge Kelley: Who was there in your home when this happened?

"A. My wife, my mother and myself."

It will be noted that Dewey did not even testify that the statement which he had made to the Sheriff was true.

In the case of Kersey v. State, 73 Fla. 832, 74 Sou. 983. Mr. Justice SHACKLEFORD, speaking for the Court said:

"Charles B. Kersey was indicted for the crime of murder in the first degree, tried before a jury, convicted of the crime of murder in the second degree and sentenced to confinement at hard labor in the State Prison during the remainder of his natural life. Before taking up for consideration the errors which have been assigned and argued before us we think it advisable to state that the evidence adduced establishes the fact that Edith Kersey, for causing whose death by shooting her with a shot gun the defendant was placed on trial under an indictment, charging him with the crime of murder in the first degree, was the lawful wife of the defendant and they were living together at the time of Edith Kersey's death as husband and wife, and had been so living together ever since the consummation of their marriage, during a period of about six weeks. The evidence further establishes that Edith Kersey came to her death from a wound in her head which was inflicted by the discharge of a shot gun loaded with powder and small shot, and that at the time of such discharge the deceased was lying in bed in the home occupied by her and her husband, the defendant. Upon these points the evidence is uncontradicted."

Again, in the course of the opinion Justice SHACKLEFORD said:

"In order to render our discussion of these two assign-ments the more readily intelligible, we would state that there were no eye witnesses to the shooting and, as the defendant frankly says' in his brief: 'It was the theory of plaintiff in error that deceased committed suicide; that she pulled the chair (which was found lying on the floor upon its back near the bed) up near the bed, placed the stock of the gun in the bottom of the chair so as to have the proper range and so that she could hold it and reach it when she was lying down; and that she, with her left hand holding the barrel or muzzle of the gun to her head, with her right hand pushed the broom stick (which was found near the bed) against the trigger of the gun and discharged it.'"

In that case the State relied largely upon circumstantial evidence, the defendant relying upon the circumstances to show that the deceased came to her death by suicide. The circumstances as shown in that case to establish unlawful homicide by the accused were not as strong as were the circumstances in this case.

It appears from the opinion as reported in the case of Sutter v. State, 105 Neb. 144, 179 N. W. 414, that in that case the State relied upon circumstantial evidence no stronger than the circumstances relied on in this case and the conviction was upheld.

The case of State v. Beeson, 155 Iowa 355. 136 N. W. 317, is to like effect.

The evidence adduced is sufficient to meet the rule re-quired in cases where circumstantial evidence is' relied upon for conviction. That is, it is not only consistent with the guilt of the accused, but is inconsistent with any other reasonable hypothesis except the guilt of the accused.

It is not necessary that circumstantial evidence so strong

and cogent as to exclude every imaginable possibility except the defendant's guilt, but it is sufficient, if it is so strong and cogent as to exclude every reasonable hypothesis except the defendant's guilt.

It could serve no useful purpose to further discuss the testimony of the other witnesses as it appears in the record.

On examination of the entire record we find no reversible error. Therefore, the judgment should be, and is, affirmed.

So ordered.

WHITFIELD, and BROWN, J. J., concur.

ELLIS, C. J., and CHAPMAN, J., dissent.

CHAPMAN, J. (dissenting)—I think the lower court erred in receiving testimony during the progress of the trial. That a motion for a new trial on the insufficiency of the testimony should have been granted. The evidence is not sufficient to support a verdict against the defendant.

PER CURIAM.—Pursuant to rehearing granted, we have heard oral argument of counsel and considered additional briefs and reconsidered the record.

On rehearing plaintiff in error has presented several grounds for contending that the judgment should be reversed, none of which contentions were presented in the court below, nor were they raised by assignments of error or otherwise except by contentions in brief and oral argument. The rule is well established that questions not presented in the court below are not to be considered in the appellate court. If it were otherwise there would be no end to litigation. The enforcement of criminal law is lax enough at best and we should not make it worse by violating the established rules of procedure and practice unless it be shown that it is essential to do so to administer justice.

We have carefully again considered the evidence as con-

tained in the transcript and while it is not sufficient to exclude every possibility that the plaintiff in error may be innocent, it is strong enough to exclude every reasonable doubt of his guilt.

The state relied upon circumstantial evidence. The circumstances shown are consistent with guilt and are not consistent with innocence.

Reverting to the statement above to the effect that we should not violate the established rules of procedure and practice unless it be shown that it is essential to do so to administer justice, we may say that we find in this record nothing that makes it essential for us to disregard such established rules.

On rehearing the plaintiff in error has contended strenuously that the court was misled and misconstrued the evidence because of statements in the brief of Attorney General, one of which was to the effect that the testimony of the sheriff showed that the defendant R. J. Dewey told the sheriff that when he could not find his truck keys he covered the body of his wife up with a blanket and went to bed and "went to sleep," when the record shows that he only said that he "went back to bed" and that next morning he "got up and went across the field and let this darkey know about it." We cannot see that whether or not Dewey said he went to sleep after he went back to bed makes any difference one way or another.

The other matter complained of is that in the brief for the Attorney General and in the opinion by the court it was stated that Dewey told the sheriff that when Dewey's mother was awakened by the report of the pistol and inquired what was the matter that he, Dewey, told her to go back to sleep, when, as a matter of fact, it was Mrs. Dewey, the defendant's mother, who was co-defendant with him, who told the sheriff that that was what happened.

Whether Dewey told his mother to go back to sleep or not can be of no material importance because the record shows that she did rouse up when the gun was fired and that she did go back to sleep and, although the defendant Dewey testified that she, his mother, was in the house with him at the time the homicide occurred, he did not testify that he said anything to her about it.

It is also contended that illegal evidence was introduced against this defendant, Dewey, and that the sheriff was allowed to testify as to statements made to him by Mrs. Vivian Dewey, R. J. Dewey's mother. At the time the sheriff made those statements as a witness on the stand Mrs. Dewey was a defendant on trial and therefore, the evidence was entirely legal and was not objected to and had it been objected to it should not have been excluded because it was admissible for the purpose of showing that Mrs. Dewey was present in the house when the homicide occurred. Aside from this, the testimony of the sheriff as to what Mrs. Dewey told him was of no value as evidence for or against either of the defendants. However, after the trial judge had instructed the jury to find Mrs. Vivian Dewey not guilty, there was no motion to exclude from consideration of the jury the testimony given by the sheriff as to what Mrs. Dewey had told him. It appears that it was considered then of no importance, and properly so.

It is also contended that certain charges given by the court were prejudicial and unwarranted and, while no exception was taken to such charges by motion for new trial or otherwise, it is now contended that the judgment should be reversed because of the giving of charges numbered 9-a and 9-b, which are as follows:

"9-A. As to the defendant, Vivian Dewey, the court charges there has been no testimony given in this cause to show that she was in anywise responsible for or connected

with the shooting of Mrs. Margaret Dewey, and you are therefore instructed to render a verdict of not guilty as to her.

"9-B. But as to the defendant R. J. Dewey the question of his guilt or innocence is submitted to you for such verdict thereon as you, in your judgment deem the evidence warrants and supports."

In connection with these charges there must be read charges 8 and 9, which are as follows:

"8. It is the contention of the defendant, R. J. Dewey, that his wife, the deceased, Mrs. Margaret Dewey, came to her death as a result of pistol wound inflicted by her own hand with suicidal intent and he denies that he shot Mrs. Dewey, or was in any way responsible for the firing of the shot which caused her death, and that at the time of the firing of the shot he was lying in front of a nearby fireplace engaged in reading. Therefore, I charge you that if you believe from the evidence that Mrs. Margaret Dewey committed suicide, and that the defendant R. J. Dewey did not shoot her as charged, then you should find the defendant Dewey not guilty, or if you have a reasonable doubt from the evidence, or the lack thereof, as to whether Mrs. Dewey killed herself, or was killed by the said R. J. Dewey, then you should find the defendant not guilty.

"9. However, if you are convinced from the evidence beyond a reasonable doubt that the defendant R. J. Dewey shot and killed his wife in manner and form as charged then you should find the defendant guilty as charged or of such degree of homicide contained within the indictment as you deem the evidence warrants and supports."

When charges 9-A and 9-B are read in connection with charges 8 and 9 there can be no ground for holding the charges misleading or prejudicial to the plaintiff in error.

The jury were the judges of the credibility of the wit-

nesses and the weight of the testimony. They saw and heard the witnesses as they testified on the stand and under a fair charge by the court they found the defendant guilty of murder in the second degree under evidence which would have warranted a verdict of murder in the first degree. An experienced, able and conscientious trial judge heard the testimony, saw the witnesses on the stand and approved the verdict by denying motion for new trial which specifically challenged the sufficiency of the evidence. Therefore, for the reasons stated herein and stated in the former opinion filed here on July 20, 1938, we should adhere to our judgment of affirmance.

It is so ordered.

TERRELL, C. J., and WHITFIELD, BUFORD and THOMAS, J. J., concur.

BROWN and CHAPMAN, J. J., dissent.

CHAPMAN, J. (dissenting)—Mr. Justice ELLIS and the writer hereof dissented from the majority opinion filed in this case. The Court ordered a rehearing and heard at the bar of this court argument of able counsel for the respective parties, based on the record presented. It is to be observed that the trouble with the members of the Court in reaching a decision is based on a question of fact rather than law. I have carefully reviewed the entire record and cannot conscientiously reach or agree to the majority opinion filed on rehearing. I take the position that the burden of proof rests on the prosecution to establish each material allegation of the indictment and this burden is required to be established or proven beyond a reasonable doubt before the jury is authorized to find a verdict of guilty. See Campbell v. State, 92 Fla. 775, 109 So. 809; Folks v. State, 85 Fla. 238, 95 So. 619. It is likewise elementary or fundamental that the law presumes that a per-

son charged with crime is innocent and the presumption thereof accompanies the defendant in each step of the case from the very beginning until overcome by competent testimony adduced on the part of the State showing the guilt of the defendant beyond a reasonable doubt. Seé Baggett v. State, 99 Fla. 252, 114 So. 236; Roe v. State, 96 Fla. 723, 119 So. 118; Campbell v. State, 92 Fla. 775, 109 So. 809; Carnley·v. State, 82 Fla. 282, 89 So. 808.

I have examined the record and fail to find any testimony supporting a motive on the part of the defendant to commit the crime. It is possible that just criticism can be made of the conduct of the defendant in not making known the death of his wife in the early part of the night or shortly after she shot herself, but in this he violated no law. While such conduct may be contrary to the habits and customs of our people, it is not *mala in se* and undue emphasis has been placed on this dereliction on the part of the prosecution. The testimony of Murray Jackson to the effect that the deceased sometime prior to her death tried to drown herself by jumping into a lake, when she was rescued from death by drowning by the defendant here; likewise, the testimony of Dr. H. M. Strickland to the effect that the deceased told him, "that she was going to leave (meaning her) home or kill kerself." It appears that the defendant supplied the motive for the deceased's death after the prosecution had utterly failed. There is about the same evidence against the defendant's mother as the defendant and the trial court directed a verdict in her behalf. The defendant and his mother were jointly indicted for the death of Mrs. Dewey. The motive for the crime became important and material, when the direct or circumstantial evidence failed to make out a satisfactory case. The evidence here is entirely circumstantial.

In Vol. 14 American Jurisprudence, par. 27, page 786, it is said:

"27. MOTIVE. In Criminal law motive may be defined as that which leads or tempts the mind to indulge in a criminal act, or as the moving power which impels to action for a definite result. It is distinguishable from intent the purpose of which is to use a particular means to effect a certain result. Motive is an inferential fact and may be inferred not merely from the attendant circumstances, but, in conjunction with these, from all previous occurrences having reference to, and connected with, the commission of the offense. It is not an essential element of crime or indispensable to a conviction. It is important only when the evidence, direct and circumstantial, fails to make out a satisfactory case, and then only as evidence. A man is not to be acquitted of crime simply because his motive for perpetrating it cannot be discovered."

Charge No. 3 given the jury is, viz.:

"3. The defendant in every criminal case is presumed to be innocent until the State has by competent evidence shown his guilt to the exclusion of and beyond a reasonable doubt, and before this presumption of innocence leaves the defendant, every material allegation of the indictment must be proven by the evidence to the exclusion of and beyond a reasonable doubt, and this presumption of innocence accompanies and abides with the defendant as to each and every material allegation in the indictment, through each stage of the trial, until it has been so met and overcome by the evidence to the exclusion of and beyond a reasonable doubt, and if any one of the material allegations of the indictment is not proven to the exclusion of and beyond a reasonable doubt, you must give him the benefit of such doubt, and acquit him or reduce the grade of the offense

as the facts as you find them from the evidence may require. But if you believe from the evidence and to the exclusion of every reasonable doubt that the defendant is guilty of the crime of murder in the first degree as charged in the indictment, or of any offense within such indictment, then you should find the defendant guilty of such offense as the facts as you find them from the evidence may require."

Consideration has been given to the case of Lewis v. State, 55 Fla. 53, 45 So. 993, to the effect that this Court in passing upon a single instruction or charge the same should be considered in connection with other charges or instructions bearing upon the same subject. It is a reasonable inference deducible from the above instruction that the jury, when it was deliberating upon a verdict to the effect that if the State failed to establish or prove by competent testimony any of the material allegations of the indictment beyond a reasonable doubt, then it was not its duty to render a verdict of not guilty and acquit the defendant, but the jury had the authority under the instruction, *supra,* to reduce the grade of the offense as the facts established would justify. This is not the law. See Hart v. State, 92 Fla. 809, 110 So. 253; Worster v. State, 82 Fla. 463, 90 So. 188; Franklin v. State, 66 Fla. 213, 63 So. 418. The defendant should have a new trial.

BROWN, J., concurs.

BROWN, J. (concurring)—Upon a further and very careful consideration of this case on rehearing, I am inclined to concur with Mr. Justice CHAPMAN in his dissenting opinion. I have reached the conclusion that justice would be best subserved by granting this plaintiff in error a new trial.